IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ROGER PARSONS,<br><br>     Plaintiff,<br><br>vs.<br><br>PIONEER SEED HI-BRED INTER-<br>NATIONAL, INC.[1],<br><br>     Defendant. | **No. 4:04-cv-40072**<br><br>**ORDER ON DEFENDANT'S<br>MOTION FOR SUMMARY<br>JUDGMENT** |

This matter comes before the Court on Defendant's Motion for Summary Judgment. Oral arguments were heard on July 7, 2005. Michael Carroll represents Plaintiff Roger Parsons ("Parsons"); Helen Adams represents Defendant Pioneer Hi-Bred International, Inc. ("Pioneer"). This matter is fully submitted and ready for disposition.

**I.    JURISDICTION**

On December 10, 2003, Parsons filed a petition in Iowa District Court for Polk County, alleging Pioneer violated provisions of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, and the Iowa Civil Rights Act, Iowa Code Chapter

_____

[1] On October 13, 2004, the parties filed a stipulation voluntarily dismissing Parsons' claims against E.I. duPont de Nemours with prejudice. Pioneer Hi-Bred International, Inc., remains as the only Defendant in the action.

216 ("ICRA").  Pioneer removed the case on February 2, 2004, under this Court's

federal question jurisdiction over the ADEA claim pursuant to 28 U.S.C. § 1331 and

supplemental jurisdiction over the ICRA claim pursuant to 29 U.S.C. § 1367(a).

## II.   FACTS

Roger Parsons began working for Pioneer on October 14, 1974.  In 2000,

Parsons was appointed Project Manager of the Warehouse Management System

("WMS"), a special warehouse management implementation project at Pioneer.

Parsons' duties included (1) working with Pioneer developers and others to match

software functionality with business needs; (2) testing, purchasing, and installing radio

frequency equipment; (3) training employees on the software system and radio fre-

quency equipment at each new implementation location; (4) assessing and recon-

figuring software coding at each new implementation location; and (5) preparing

implementation plan budgets.[2]

In September 2002, Pioneer's Vice President of Global Supply Management,

Dean Oestreich ("Oestreich"),[3] and Pioneer's Director of North American Corn

---

[2] In Paragraph 8 of Defendant's Statement of Undisputed Facts, Pioneer
deferred to Parsons' ICRC Questionnaire for a description of the WMS Manager
duties.  Parsons admitted to those facts in Response to Pioneer's Statement of Facts.

[3] On October 8, 2002, Oestreich became Pioneer's Vice President of North
American Business and was appointed President of Pioneer in January of 2003.

Production, Bill Tomlinson ("Tomlinson"),[4] determined that there was no longer a need for a full-time WMS Project Manager.  Oestreich issued a "Business Decision Statement" announcing that the initial phases of the WMS had ended in North America and therefore the project had shifted away from strategy setting, design, and development to maintenance and control.  Because the project now required less skill and responsibility to maintain and coordinate, Parsons' position of WMS "Manager" would be eliminated, and the position of WMS "Coordinator" would be created to handle the project maintenance duties.  Pioneer anticipated filling the position with a current employee or outsourcing from Europe.  The statement also indicated that there were no positions in the department matching Parsons' skill level, and due to the reduction in force, Parsons' employment would be terminated.

Oestreich called Parsons to his office on September 25, 2002, to inform Parsons that his position had been eliminated and he was being terminated.  Lee Slater ("Slater") from Pioneer's Human Resources Department, also participated in the meeting to explain the available severance options to Parsons.  Under the first severance option, the effective termination date would be September 30, 2002 ("September 30th Option"); Parsons would receive a large severance payment but

_____

[4] In September 2002, Tomlinson was Parsons' immediate supervisor.

forfeit stock options.  Under the second severance option, the effective termination date would be October 30, 2002 ("October 30th Option"); Parsons would receive a smaller severance payment and keep stock options.  Parsons received copies of both severance agreements and was reminded that he had until October 16, 2002 (twenty-one days), to consider the agreements and make his decision.[5]

During the September 25, 2002, meeting, Parsons asked whether he would retain his years of service if he found a qualifying position at Pioneer within one year; Oestreich and Slater told Parsons he would.  The only reference to age at that meeting was a reference made by Slater informing Parsons he was eligible for early retirement.

Parsons met with attorney Frank Harty and discussed the severance options; after that discussion, Parsons decided to sign the September 30th Option.  Parsons signed that agreement ("the Agreement") and delivered it to Slater on October 9, 2002, seven days before it was due.  Parsons' termination was effective September 30, 2002; he was fifty-five years old at the time.

On October 16, 2002, Pioneer announced that Larry Lubinus would fill the position of "Warehouse Management Coordinator" ("WMC").  Lubinus was forty-one years old and had been working for Pioneer since September 1984.  Prior to becoming

---

[5] Because E.I. duPont de Nemours and Pioneer Hi-Bred International, Inc., had recently merged, all Pioneer employees, including Parsons, were required to sign a "Change-in-Control" option ("CIC option") by September 30, 2002.

WMC, Lubinus was "Black Belt in Supply Management" for Pioneer's "Six Sigma" problem-solving and project-management program.  As a Black Belt in Supply Management, Lubinus was responsible for working on projects and mentoring less-trained Six Sigma Black Belts and Green Belts within the Supply Management Department.

As WMC, Lubinus' responsibilities included (1) coordinating and scheduling the modifications, implementations, and usage of warehouse management technologies within North America; (2) partnering with other departments at Pioneer to determine the best practices for warehouse operations; and (3) providing the information management department with the business requirements related business planning and mobile radio frequency software.  Lubinus continued to perform the Six Sigma Black Belt duties in addition to the WMC duties.

On February 28, 2003, Parsons filed a complaint with the Iowa Civil Rights Commission ("ICRC") charging Pioneer with discrimination under ICRA.  The complaint was cross-filed with the Equal Employment Opportunity Commission ("EEOC").  Parsons received right-to-sue letters from the ICRC and the EEOC on September 12, 2003, and September 24, 2003, respectively.

On December 10, 2003, Parsons filed a two-count petition in Iowa District Court for Polk County alleging Pioneer terminated him because of his age in violation of 29 U.S.C. § 623 and Iowa Code § 216.  The case was removed to federal court on February 2, 2004.

Defendant filed the present motion for summary judgment on April 15, 2005, arguing Parsons released any claims under the ADEA when he signed the Agreement. Pioneer alternatively argues Parsons cannot establish a prima facie case of discrimination under the ADEA nor can he show Pioneer's business decision was pretextual. Parsons resists the motion, arguing the release was invalid because it did not comply with the Older Workers Benefits Protection Act ("OWBPA") of the ADEA. Parsons further argues he has established a prima facie case of age discrimination under the ADEA and Pioneer's proffered reason for firing him was pretextual.

## III.   STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) states "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Evers v. Alliant Techsys., Inc., 241 F.3d 948, 953 (8th Cir. 2001) ("Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, indicates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a

6

genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (quoting Fed. R. Civ. P. 56(c)).

"To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case on which it has the burden of proof at trial." Cont'l Grain Co. v. Frank Seitzinger Storage, 837 F.2d 836, 838 (8th Cir. 1988). Rule 56(e) requires "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The Court's function on a motion for summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Niagara of Wis. Paper Corp. v. Paper Indus. Union-Mgmt. Pension Fund, 800 F.2d 742, 746 (8th Cir. 1986). "'On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Econ. Hous. Co. v. Cont'l Forest Prods., Inc., 757 F.2d 200, 203 (8th Cir. 1985). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 257. On the other hand, "[w]hen a

motion for summary judgment is made and properly supported, the nonmoving party may not rely on bare allegations but must set forth specific facts showing that there is a genuine issue for trial." LeBus v. Northwestern Mut. Life Ins. Co., 55 F.3d 1374, 1376 (8th Cir. 1995).

## IV.   DISCUSSION

Pioneer asserts summary judgment is appropriate for two reasons: (1) Parsons waived his right to bring an ADEA claim by signing the Agreement which complied with the OWBPA of the ADEA; and (2) Parsons cannot establish a prima facie case of age discrimination nor can he show that Pioneer's proffered reason for termination was pretextual.

### A.   Validity of the Waiver Under the OWBPA

"The statutory requirements for waiver of ADEA claims are strict and unqualified; if an employer fails to meet any of the statutory requirements, the waiver is ineffective as a matter of law." Thomforde v. Int'l Bus. Machs. Corp., 406 F.3d 500, 503 (8th Cir. 2005) (citing Qubre v. Entergy Operations, Inc., 522 U.S. 422, 427 (1998).  For a release to be valid, it must be knowing and voluntary. Id. (citing 29 U.S.C. 626 § (f)(1)).

For a waiver to be knowing and voluntary under the statute, (1) it must be "part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;" (2) "the waiver specifically refers to rights or claims arising

8

under this chapter;" (3) "the individual does not waive rights or claims that may arise after the date the waiver is executed;" (4) "the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;" (5) "the individual is advised in writing to consult with an attorney prior to executing the agreement;" (6) "the individual is given a period of at least 21 days within which to consider the agreement;" and (7) "the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired."  29 U.S.C. § 626(f)(1)(A)-(G).

The pertinent provisions of Parsons' Agreement stated,

**10.**  Further, you agree to keep the terms of this settlement and release confidential.  You hereby acknowledge that failure to abide by the terms of this Agreement could result in the loss of the consideration provided for in Sections 11(a) and 11(b) herein, unless such legal action directly pertains to the Age Discrimination in Employment Act. . . .

**11.**  In consideration of receipt of a lump sum payment of (a) Nine Thousand Eight Hundred Ninety-Six Dollars ($9896.00); the prorated portion of Part II of the Annual Reward Program Bonus in the amount of Eleven Thousand Five Hundred Seventy-Eight Dollars ($11,578.00) . . , you hereby forever release and discharge Pioneer, its directors, officers and employees from . . . , claims or demands or expenses of any kind (including attorney fees and costs actually incurred), at law or equity, to settle potential claims you may have pursuant to . . . the Age Discrimination in Employment Act or . . . Iowa Code Chapter 216 . . . Pioneer and any other agreements executed with Pioneer, either oral or written.  Nothing in this Agreement shall be construed to waive your rights under the Pioneer Hi-Bred International, Inc. Retirement Plan or the Pioneer Hi-Bred Medical and Life Insurance Plans for claims that may arise following the effective date of this Agreement.

. . . .

**17.**  In any action to enforce this Agreement, except a claim pertaining to the Age Discrimination in Employment Act, the prevailing party's attorney fees shall be paid by the party against whom this Agreement is being enforced.

. . . .

**20.**  You acknowledge that you have been provided with a copy of this Agreement for purposes of review with your attorney prior to your executing this Agreement.  You understand that you have the option to take up to twenty-one (21) days to consider this Agreement before signing.

**21.**  You understand that you have the right to revoke this Agreement within seven (7) days from the date you execute this Agreement.  This Agreement shall not become effective until such time as that seven (7) day period has lapsed.

**22.**  This Agreement shall be governed by the laws of the State of Iowa.

Def. App. at 130-33 (emphasis added).

Plaintiff complains that the Agreement is invalid because paragraph 10 appears to allow a claim for age discrimination while paragraph 11 holds Pioneer faultless for a lawsuit.  Parsons also argues that Pioneer never asked him whether he understood the Agreement.  Comparing Thomforde v. International Business Machines, Inc., Parsons asserts the language of the present Agreement was not written in a manner "calculated to be understood."  Thomforde v. Int'l Bus. Machs., Inc., 406 F.3d at 503.  Pioneer counters that the Agreement is valid and Pioneer complied with the OWBPA.  Pioneer asserts Thomforde is distinguishable from the present case.

10

In the <u>Thomforde</u> case,[6] the defendant employer, IBM, implemented an involuntary termination program (referred to as the Server Group Resource Action ("SGRA")) as part of a reduction in force ("RIF").  <u>Id.</u> at 501.  Thomforde was selected for termination and presented with an agreement entitled "General Release and Covenant not to Sue".  <u>Id.</u>  The agreement stated in pertinent part,

> In exchange for the sums and benefits received pursuant to the terms of the [SGRA], DALE J. THOMFORDE (hereinafter "you") agrees to release and hereby does release [IBM] . . . from all claims, demands, actions or liabilities you may have against IBM of whatever kind including, but not limited to, those that are related to your employment with IBM, the termination of that employment, or other severance payments or your eligibility for participation in the Retirement Bridge Leave of Absence, or claims for attorneys' fees.
> ....
> ... You also agree that this *Release* covers, but is not limited to, claims arising from the [ADEA], as amended, ... and any other federal, state or local law dealing with discrimination in employment including, but not limited to, discrimination based on sex, sexual orientation, race, national origin, religion, disability, veteran status, or age.
> You agree that you will never institute a claim of any kind against IBM . . . including, but not limited to, claims related to your employment with IBM or the termination of that employment or other severance payments or your eligibility for participation in the Retirement Bridge Leave of Absence.  If you violate this *covenant not to sue* by suing IBM  . . . , you agree that you will pay all costs and expenses of defending against the suit incurred by IBM . . . , including reasonable attorneys' fees, and all further costs and fees, including attorneys' fees, incurred in connection with collection.  This *covenant not to sue* does not apply to actions

---

[6] A comprehensive discussion of the case is necessary because Parsons' legal arguments are based almost exclusively on a comparison of facts of the <u>Thomforde</u> case with those of the present case.

based solely under the [ADEA], as amended.  That means that if you
were to sue IBM . . . only under the [ADEA], as amended, you would
not be liable under the terms of this *Release* for their attorneys' fees and
other costs and expenses of defending against the suit.  This *Release*
does not preclude filing a charge with the U.S. Equal Employment
Opportunity Commission.

Id. at 501-02 (emphasis added).

Before signing the agreement, Thomforde asked his supervisor if the word

"exception" in the covenant not to sue meant that he could file a claim under the

ADEA.  Id. at 502.  After contacting the legal department, the supervisor emailed

Thomforde the following response:  "Regarding your question on the General Release

and Covenant Not to Sue, the wording is as intended by IBM.  The site attorney was

not comfortable providing an interpretation for you and suggested you consult with

your own attorney."  Id.  Thomforde met with his own attorney and concluded he

could sign the agreement and still pursue an age discrimination claim against IBM, as

long as it was limited to a claim under the ADEA.  Id.  Along with the signed agree-

ment, Thomforde submitted a letter informing IBM that he was going to submit a

complaint to the EEOC, and if necessary, he would pursue legal action as allowed

under the agreement.  Id.

Thomforde submitted a complaint to the EEOC, and after receiving a right-to-

sue letter, he filed an action in federal district court.  Id.  IBM filed a motion for

summary judgment arguing that by signing the agreement, Thomforde released all

claims against IBM.  Id.  The district court granted IBM's motion finding the

12

agreement was unambiguous and enforceable and complied with OWBPA; therefore, by signing the agreement Thomforde clearly waived any claims against IBM.  <u>Id.</u> at 503.

On appeal, the Eighth Circuit reversed, concluding the agreement could be misread.  <u>Id.</u>

> Thus, one plausible reading of the document reveals that the employee releases IBM from all ADEA claims and agrees not to institute a claim of any kind against IBM, except the employee may bring an action based solely under the ADEA.  Without a clear understanding of the legal differences between a release and a covenant not to sue, these provisions would seem to be contradictory; how can an employee bring a suit solely under the ADEA if the employee has waived all claims under the ADEA?

<u>Id.</u>  Despite IBM's protests that the terms "release" and "covenant not to sue" were separate and distinct, the court found the distinction was amorphous.  <u>Id.</u> at 503-04.

> The intended effect of the Agreement was to release the employee's substantive claims under the ADEA, while preserving the employee's right to challenge *the validity* of the release through a lawsuit, as provided by the regulations.  Yet, the Agreement does not explain how the provisions relate to each other or the limited nature of the exception to the covenant not to sue in light of the release of claims.  Once IBM chose to use the legal terms of art in the Agreement, IBM had a duty to carefully explain the provisions.

<u>Id.</u> at 504 (internal citations omitted) (citing 29 C.F.R. § 1625.23 which prohibits inclusion of a waiver provision penalizing a party for challenging the waiver's validity).

The court also faulted IBM for refusing to provide clarification to Thomforde when he asked about specific terms in the agreement.  <u>Id.</u>  The court concluded that

the agreement was insufficient as a matter of law to waive the employee's rights under the ADEA.  Id. at 505.

The Agreement and circumstances at issue in the present case are distinguishable from those at issue in Thomforde.  First, Parsons' Agreement did not contain both a covenant not to sue and a release; therefore, there was no confusion caused by the interchangeable use of those terms.  Second, paragraphs 10 and 17 of the Agreement specified that the obligation to repay consideration applied to a lawsuit to enforce the Agreement.

Third, the circumstances before and after Thomforde signed his agreement were not present here.  In the Thomforde case, before he signed his agreement, Thomforde specifically asked IBM if he was waiving his right to file a claim under the ADEA; IBM declined to answer, telling him to seek legal advice for an answer.  Id. at 502.  In the present case, Parsons posed only one question to Oestreich and Slater. The question was whether he would maintain his years of service if he found another qualifying position at Pioneer within one year.  Oestreich and Slater told Parsons he would.  Therefore, in contrast to IBM's response in Thomforde, Pioneer answered Parsons' question immediately.  Parsons did not ask any other questions of Pioneer regarding the Agreement.  Furthermore, whether Parsons maintained his years of service is not at issue in this action; whereas, the question posed by Thomforde – whether he could sign the agreement and still bring an action under the ADEA – was the central issue in the Thomforde case.  Id. at 500-04.

14

Parsons also argues that Pioneer *never asked him* if he understood how paragraphs 10 and 11 related to each other.  This argument is a non-issue.  The OWBPA does not require an employer to ask whether an employee understands the provisions.  In Thomforde, the Eighth Circuit took issue with IBM's failure to answer a question posed by Thomforde, not its failure to affirmatively ask Thomforde if he understood each provision of the agreement.  Id. at 504.

Fifth, in Thomforde, IBM was immediately on notice Thomforde did not understand he waived his right to seek action under the ADEA because Thomforde attached a letter to his severance agreement informing IBM of his intention to seek legal action under the "anti-discrimination statutes."  Id.  In the present case, Parsons does not complain that he was confused about the provisions of the Agreement; rather, his assertion is that *he did not realize* he had an ADEA claim until he discovered that his position had been reclassified and a younger worker had replaced him.[7]  The Thomforde court was troubled by the agreement's lack of clarity

_____

[7] In his Complaint, Parsons alleged,
11.  Parsons was not informed that he was being replaced by a younger employee.
12.  Because at the time he had no reason not to believe Pioneer's reason for his termination, he signed an Agreement that offered him a sum of money in exchange for release of its liability.
13.  On October 21, 2002, five days after the seven-day right to revoke under the Agreement ended, Larry Lubinus, forty-one years old, was hired to perform the same duties Parsons performed at the time he was terminated.
Complaint at ¶¶ 11-13 (emphasis added).

15

combined with IBM's refusal to answer Thomforde when he asked for clarification. Id. at 504 ("Given the lack of clarity in the Agreement, *and* IBM's declination to tell Thomforde what it meant by the language, we hold that the Agreement is not written in a manner calculated to be understood by the intended participants as required by the OWBPA.") (emphasis added). Neither of those problems are present here.

Parsons' Agreement complies with all the provisions of the OWBPA, 29 U.S.C. § 626(f)(1)(A)-(G):  (A) the Agreement was between Parsons and Pioneer and it was written in a manner understandable to Parsons, a college-educated individual with a bachelor of science degree in agricultural business and a teaching certificate in vocational agriculture; (B) paragraph 11 of the Agreement specifically refers to rights or claims arising under the ADEA; (C) paragraph 11 of the Agreement states that Parsons was not required to waive any rights or claims that arose after the date the waiver was executed; (D) paragraph 10 of the Agreement set forth the valuable consideration Parsons received in exchange for the waiver; (E) paragraph 20 of the Agreement advised Parsons to seek the advice of an attorney before executing the Agreement; (F) paragraph 20 of the Agreement indicated that Parsons had up to twenty-one days to consider the Agreement; and (G) paragraph 21 of the Agreement stated that once signed, Parsons had seven days to revoke the Agreement.

Under the circumstances of this case, the Court finds Parsons' waiver was knowing and voluntary.[8]  Parsons was well-educated, the language of the Agreement was straight-forward, he was given ample time to consider the Agreement, the Agreement encouraged him to seek counsel, and it was supported by valuable consideration. Parsons testified at his deposition that when he met with attorney Frank Harty, he asked Harty about two provisions of the Agreement.  Parsons further testified that Harty answered his questions, he understood Harty's answers, and he was not confused about his rights under the Agreement.[9]  The record does not reflect the

---

[8] The Eighth Circuit has not set forth the proper test to determine what constitutes "knowing and voluntary" under the OWBPA.  See Thomforde, 406 F.3d at 505 ("IBM agreed at oral argument that if we found the waiver deficient under the statute, we need not decide the proper test to apply to determine whether the waiver was also knowing and voluntary.  We leave that discussion for another day.") (citations omitted).

[9] At his deposition, Parson said he asked Harty about two provisions in the Agreement.  The following is the exchange between Pioneer's counsel (Adams) and Parsons:
Q:  Was there anything about Exhibit 15 [the Agreement] that you did not understand at the time that you signed it?
A.  I would have to say yes.
Q.  What did you not understand about it?
A.  One place in there it holds Pioneer faultless for lawsuit.  Another paragraph or section it says that there - - - it seemed to me it still said that there was potential for age discrimination.  That was - - That was my question to Frank: interpret those two different sections.
Q.  So you did have an opportunity to discuss those with Mr. Harty; correct?

details of the discussion between Parsons and his attorney nor the attorney's advice.

However, whether his counsel analyzed the Agreement in like fashion to Pioneer,

advised Parsons that the Agreement would not preclude an ADEA action, or offered a

completely different assessment, Parsons understood the attorney's explanation,

signed the Agreement, and offered no suggestion that he lacked an understanding of

---

A.  Yes.

Q.  All right.  Did Mr. Harty give you an answer that you understood?

A.  Yes.

Q.   And did you get that answer prior to signing Exhibit 15 on October 9th?

A.  Yes.

Q.  Anything else about Exhibit 15 that you did not understand prior to the date you signed it?

A.  No.

Q.  And I'm understanding correctly that you did not ask any questions of anyone at Pioneer about exhibit 15; correct?

A.  Yes.

Q.  Did you have any further discussion with Dean Oestreich about your termination other than the meeting on September 25th?

A.  No.

Q.  Have you talked to him at all since September 25th?

A.  No.

Q.  Have you had any other discussion with Lee Slater about your termination other than the meeting with her on September 25th?

A.  Yes, I had e-mails back and forth clarifying some different parts on the early retirement and medical benefits, those kinds of things.

Q.  Other than e-mails to her, did you have any other conversations with Lee Slater about your termination?

A.  Not specifically about the termination.

Def. App. 56-58.

the terms.  In fact, the first time Parsons mentioned that he was confused about those provisions was at his deposition.  See Cassiday v. Greenhorne & O'Mara, Inc., 220 F. Supp. 2d 488, 493-94 (D. Md. 2002) (finding under the totality of the circumstances the plaintiff knowingly and voluntarily waived her Title VII rights because she was knowledgeable, nothing precluded her from negotiating the terms of the waiver, the agreement was non-complex and used straight forward language, she had ample time to consider the document, her employer encouraged her to consult a lawyer, and the waiver was supported by consideration); Sheridan v. McGraw-Hill Co, Inc., 129 F. Supp. 2d 633, 637 (S.D.N.Y. 2001) (finding the waiver complied with the provisions of the OWBPA where the plaintiff was competent to enter into the waiver, and a plain reading of the waiver clearly released the defendant employer from claims arising under the ADEA).

The Court finds the Agreement complies with the OWBPA and sets forth a valid waiver of Parsons' ADEA claim.  Therefore, Parsons waived his right to bring the present action, and the case must be dismissed.

Even assuming the absence of an effective waiver, the claim would be infirm. Parsons has not established a prima facie case of discrimination under the ADEA, nor has he shown that Pioneer's proffered reason for terminating him was pretextual.

These issues were also fully briefed and argued.  Accordingly, the Court briefly discusses those arguments.

### B.   Prima Facie Case of Discrimination Under the ADEA

In cases where "the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the <u>McDonnell Douglas</u> analysis, including sufficient evidence of pretext."  <u>Griffith v. City of Des Moines</u>, 387 F.3d 733, 736 (8th Cir. 2004) (citing <u>Harvey v. Anheuser-Busch, Inc.</u>, 38 F.3d 968, 971 (8th Cir. 1994)); <u>see</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under <u>McDonnell Douglas</u>, Plaintiff must first establish a prima facie case of discrimination.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000).

Generally, to establish a prima facie case of discrimination, a plaintiff must show the following: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the position by meeting employer's legitimate job-related expectations; (3) plaintiff suffered an adverse employment action; (4) under circumstances that would allow a reasonable trier of fact to infer that unlawful discrimination occurred.  <u>See</u> <u>Whitley v. Peer Review Sys., Inc.</u>, 221 F.3d 1053, 1055 (8th Cir. 2000) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).  If Plaintiff is able to establish a prima facie

case, the burden of *production* shifts to the Defendant to show a legitimate, non-discriminatory reason for its action. <u>Reeves</u>, 530 U.S. at 142.

Upon such a showing, the presumption of discrimination disappears, <u>see</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 510 (1993), and the burden shifts once more to the Plaintiff, who must prove that the Defendant's articulated justification is a pretext for discrimination. <u>Reeves</u>, 530 U.S. at 142-43. The Plaintiff may accomplish this either by rebutting the proffered reason with evidence of pretext or discriminatory animus. <u>McDonnell Douglas</u>, 411 U.S. at 804-05; <u>see also</u> <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981) (finding "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination"), or by demonstrating that the proffered explanation is "unworthy of credence." <u>Reeves</u>, 530 U.S. at 147; <u>Burdine</u>, 450 U.S. at 256; <u>Weiland v. El Kram, Inc.</u>, 233 F. Supp. 2d 1142, 1151-52 (N.D. Iowa 2002).

In other words, where the Plaintiff produces no strong (direct) evidence that illegal discrimination motivated the alleged adverse employment action, the Plaintiff "must produce sufficient circumstantial evidence of illegal discrimination under the <u>McDonnell Douglas</u> paradigm – by presenting a prima facie case of intentional discrimination plus sufficient evidence that one or more of the [defendant's] proffered nondiscriminatory reasons is a pretext for unlawful discrimination." <u>Griffith</u>, 387 U.S. at 736-37. The burden of *persuasion* on the ultimate question of discrimination

21

remains at all times with the Plaintiff.  Reeves, 530 U.S. at 142 ("'The ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated

against the plaintiff remains at all times with the plaintiff.'") (quoting Burdine, 450

U.S. at 253).[10]

Under both the ADEA and ICRA, it is unlawful for an employer to discriminate

against an employee in the protected age class.  See 29 U.S.C. §§ 623(a)(1), 631

(providing protection for individuals who are at least 40 years of age); Iowa Code

Chap. 216.  To establish a prima facie case of age discrimination, a plaintiff must

show  "(1) that he is within the protected age group; (2) that he met applicable job

qualifications; (3) that he was discharged; and (4) that, after his discharge, the position

remained open and the employer sought applicants with similar qualifications to fill the

position."  Bashara v. Black Hills Corp., 26 F.3d 820, 823 (8th Cir. 1994) (citing

Holley v. Sanyo Mfg., Inc., 771 F.2d 1161, 1164 (8th Cir. 1985)).  Replacement by a

younger worker is usually enough circumstantial evidence that age was a factor in the

termination.  Chambers v. Metro. Prop. and Cas. Ins. Co., 351 F.3d 848, 855 (8th

Cir. 2003).

"In the context of a reduction in force, however, the fourth requirement creates

difficulties.  The plaintiff's position does not remain open; rather, it is eliminated or

---

[10] When evaluating civil rights cases brought under Iowa Code § 216 ("ICRA"),
Iowa courts turn to federal law for guidance.  Vivian v. Madison, 601 N.W.2d  872,
873 (Iowa 1999).  Analysis of ICRA claims is the same as claims under Title VII.  Id.

combined with another position." <u>Bashara</u>, 26 F.3d at 823.  Therefore, to prove the fourth factor in an RIF case, the Plaintiff is required to produce additional evidence that age was a factor in his termination.  <u>Id.</u>  "'A plaintiff may meet the last require-ment by presenting either statistical evidence (such as a pattern of forced early retirement or failure to promote older employees) or 'circumstantial' evidence (such as comments and practices that suggest a preference for younger employees).'" <u>Chambers</u>, 351 F.3d at 856 (quoting <u>Hanebrink v. Brown Shoe Co.</u>, 110 F.3d 644, 646 (8th Cir. 1997)).

Parsons concedes that this case does not involve direct evidence of age discrim-ination.  Accordingly, to survive summary judgment, Parsons must present a prima facie case of age discrimination under the familiar <u>McDonnell Douglas</u> burden-shifting paradigm.  <u>Id.</u> at 855.  Parson clearly satisfies the first three elements of prima facie case: (1) he is a member of the protected class of individuals over the age of 40; (2) he met the applicable job qualifications; and (3) he suffered adverse employment action.  As for the fourth element, Parson asserts he has met the burden of showing additional evidence that age was a factor in Pioneer's decision to terminate him on September 25, 2002, by demonstrating that sixteen days after his termination was effective, Pioneer hired Lubinus, a forty-one year old, substantially younger individual to replace him.

### 1.    Was Parsons' termination part of an RIF?

Parsons argues that because Lubinus was performing essentially the same duties that Parsons performed before being terminated, a jury could infer that Parsons' job had not been eliminated but that Parsons was replaced by someone substantially younger.  Parsons points out that he was the only one terminated in his department and his duties were absorbed by Lubinus.

Pioneer counters that at the time Parsons was terminated, Pioneer and duPont were involved in a merger and there was a company-wide reduction in force.  Accordingly, Oestreich and Tomlinson made a business decision to eliminate the position of WMS manager because the implementation phase of the WMS project had been completed and a full-time manager to implement the project was no longer necessary.  They determined that the remaining WMS duties did not require an employee of Parsons' skill level working on the project full time.

In his affidavit and at deposition, Lubinus testified that when he became WMC, he continued to perform his responsibilities as Six Sigma Black Belt *in addition* to WMC duties.  Initially, WMC duties consumed 75 to 85 percent of his time, allowing him to spend only 15 to 25 percent of his time on Six Sigma duties.  By March 2003, five months after becoming WMC, the duties of WMC became more cyclical, con-suming from zero to 90 percent of his time.  He stated that the WMC position takes 90 percent of his time only when he is required to travel to fulfill those duties; other-wise, he estimates that on average, the WMC duties occupy 50 percent of his time.

Parsons' own description of his former duties belies the assertion that his position was not eliminated. He described that the WMS manager was a full-time position and the primary function was the *implementation* of the WMS project at new locations within North America.[11]  By contrast, the new WMC position was less than full time, and the primary function was to *maintain* the WMS project. Evidence that Lubinus took time to learn the new duties and consequently the WMC position initially took up more of his time does not create a fact question that the WMS manager position was not eliminated.  See, e.g., Minton v. Am. Bankers Ins. Group, Inc., No. 02-12942, 2003 WL 21303330, at *1 (11th Cir. 2003) (per curium) (reasoning there was a legitimate reduction-in-force where defendant employer was going through a merger which resulted in the elimination of plaintiff's position and some, but not all, of the former employee's duties were absorbed by an existing younger employee).

Furthermore, Parsons admits that when a company is exercising its business judgment it need not produce evidence of financial distress or a business plan with objective criteria in order to legitimize the reduction in force.  Hardin v. Hussmann Corp., 45 F.3d 262, 265 (8th Cir. 1995 ("When a company's decision to reduce its workforce is due to the exercise of its business judgment it need not provide evidence of financial distress to make it a 'legitimate' RIF.").  Parsons argues that a simple

---

[11] See description of WMS Manager duties, supra, at Part II, text at note 2.

25

assertion that it was using "business judgment" does not exculpate the employer; the reduction in force must be genuine.  See Hillebrand v. M-Tron Indus., Inc., 827 F.2d 363, 365 (8th Cir. 1987) (finding that in the absence of an objective plan or targeted group, an employer's assertion that it used its business judgment in making the employment decision, may not be enough to require plaintiff to show additional proof that age was a factor in order to survive summary judgment in a reduction in force cases).

The record supports Pioneer's assertion that Parsons' termination was part of an RIF.  First, Pioneer and duPont were going through a merger at the time.  Second, Parsons admits knowing that individuals in other departments were being laid off as part of the merger.  Third, Oestreich and Tomlinson consulted and made a business judgment decision that the current status of the WMS project did not necessitate a full-time manager of Parsons' skill level.  Fourth, Parsons' full-time position was eliminated, and his former duties were absorbed by a less-than-full-time position.  Parsons has not produced any statistical evidence that his termination was part of a pattern of forced early retirement or evidence of comments or practices that suggest a preference for younger employees.  Chambers, 351 F.3d at 856.  Parsons has not satisfied the heightened burden required to prove the fourth factor of a prime facie case of age discrimination where an RIF is involved in the termination.  Id.

Pioneer argues that even if Parsons were able to establish the necessary elements of a prima facie case under the ADEA, he cannot rebut the nondiscriminatory

reason Pioneer proffered for terminating him.  <u>Reeves</u>, 530 U.S. at 142; <u>Mayer v.</u>
<u>Nextel West Corp.</u>, 318 F.3d 803, 807-08 (8th Cir  2003).

### 2. Was Pioneer's proffered reason for terminating Parsons pretextual?

Pioneer's stated reason for terminating Parsons was that his position was being
eliminated and there were no other positions in the department that matched his skill
level.  Pioneer explained that the phase of the project Parsons had been appointed to
manage had ended in North America.  Consequently, the need for a full-time manager
to *implement* the project was no longer necessary.

Since Pioneer offered a legitimate, nondiscriminatory reason for terminating
Parsons, the burden shifts back to Parsons to produce sufficient evidence that age
was a determinative factor in Pioneer's decision.  <u>Reeves</u>, 530 U.S. at 142-43.
Parsons "'can avoid summary judgment only if the evidence considered in its entirety
(1) creates a fact issue as to whether the employer's proffered reasons are pretextual
*and* (2) creates a reasonable inference that age was a determinative factor in the
adverse employment decision.'"  <u>Mayer</u>, 318 F.3d at 810 (quoting <u>Rothmeier v. Inv.</u>
<u>Advisers, Inc.</u>, 85 F.3d 1328, 1336-37 (8th Cir. 1996)) (emphasis added in <u>Mayer</u>).

Parsons argues there is sufficient evidence for a factfinder to conclude that age
motivated Pioneer's decision to terminate him.  First, Parsons alleges that Pioneer
never told him his position was going to be eliminated and went to great lengths to
prevent him from finding out the true reasons for his termination.  Second, he alleges

27

there was never any discussion of how to maintain his position, or to downgrade his pay, to allow keeping him employed.  Third, Parsons argues Lubinus was unqualified for the WMC position, but Pioneer offered it to him because the Six Sigma position was coming to an end and Pioneer was looking for a permanent home for Lubinus. Fourth, Parsons further argues the department was still being restructured to accommodate the WMC position nine months after he was terminated.  Fifth, Parsons' final assertion is that a jury could conclude that Pioneer was terminating him for reasons wholly unrelated to the necessity of consolidating his current position.

These allegations do not create a reasonable inference that age was a determinative factor in Pioneer's decision to terminate Parsons and need not be resolved. See id. (reasoning that the court need not resolve other allegations presented by plaintiff, rather the court need only determine whether the evidence offered "creates a reasonable inference that age was a determinative factor" in the plaintiff's termination).  Parsons' reliance on allegations that "something else" motivated Pioneer's decision is inadequate to allow the question of age discrimination to go to a jury.  Id. (finding plaintiff's arguments that nothing in the record "excluded" age discrimination as the employer's motive for terminating him misses the mark, reasoning, "[b]efore a court can allow a discrimination case involving only circumstantial evidence to go to a jury, it must find sufficient evidence that would allow a reasonable factfinder to infer that age was a determinative factor in the adverse employment action.")

During his deposition, Parsons testified that the single reason he believes Pioneer discriminated against him due to age was because Lubinus performed all of his former job duties.  This is simply insufficient as a matter of law to submit to a jury because no rational factfinder could conclude on that basis that Pioneer's termination decision was discriminatory.

**V.     CONCLUSION**

The Court finds the termination Agreement Parsons entered into with Pioneer complies with the OWBPA and was a valid waiver of his right to bring an action under the ADEA.  Furthermore, the evidence Parsons set forth is insufficient to establish a prima facie case of age discrimination or to show that Pioneer's proffered reason for terminating him was pretextual.  For the reasons stated, the Court finds Defendant's Motion for Summary Judgment (Clerk's No. 18) must be **granted**.  The case is dismissed and the Clerk of Court is directed to enter judgment in favor of the Defendant and against the Plaintiff.

**IT IS SO ORDERED.**

Dated this 10th day of August, 2005.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT